UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| COLE ULRICH *et al.*, | | |
| Plaintiffs, | | 25 Misc. 545 (PAE) |
| -v- | | |
| GENERAL MOTORS LLC, | | OPINION & ORDER |
| Defendant. | | |

PAUL A. ENGELMAYER, District Judge:

Before the Court are motions to quash subpoenas (the "Subpoenas") in three Michigan

class action lawsuits (the "underlying actions") brought against General Motors LLC ("GM").

These actions contend that eight-speed automatic transmissions in certain GM vehicles were

defective. The Subpoenas are directed at Season4 LLC ("S4"), a service provider retained by

Berger Montague PC ("class counsel"), counsel for the class in the underlying actions. The

Subpoenas seek documents related to the underlying actions, including questionnaires submitted

by GM consumers to class counsel via S4's website and communications between S4 and class

counsel.

Plaintiffs in the underlying actions, class counsel, on behalf of "Unidentified

Respondents,"[1] and S4 separately move to quash the subpoenas, which they claim improperly

seek privileged and protected communications. For the reasons that follow, the Court grants the

motions with respect to all documents sought by the Subpoenas, save two discrete categories of

---

[1] Class counsel defines Unidentified Respondents as "consumers who did not become Plaintiffs
but who sought legal advice and representation about possibly becoming Plaintiffs" in the
underlying actions. Dkt. 6 ("CC Mot.") at 1.

1

documents: (1) S4's public forum posts and advertisements related to the underlying actions, and (2) the names of all questionnaire respondents and dates of their submissions.

## I.    Background

### A.    The Underlying Actions

In 2018 and 2019, class counsel commenced five actions against GM, alleging defective eight-speed automatic transmissions, which were consolidated into a single case in the Eastern District of Michigan: *Speerly v. General Motors LLC*, No. 19 Civ. 11044 (E.D. Mich) (the "*Speerly* Action"). Dkt. 6 ("CC Mot.") at 5–6. On September 30, 2019, class counsel filed a consolidated amended class action complaint in that case, with 64 plaintiffs. *Id.* Class counsel thereafter filed two addenda to the class action complaint, adding numerous named plaintiffs. *Id.*

On April 12, 2022, six plaintiffs from California, Indiana, Michigan, New Jersey, and Washington initiated another case against GM in the Eastern District of Michigan: *Helms v. General Motors LLC*, No. 22 Civ. 10783 (E.D. Mich) (the "*Helms* Action"). *Id.* at 7. They later added 15 more plaintiffs, from nine additional states. *Id.*

On April 17, 2024, class counsel filed a class action complaint in the Eastern District of Michigan: *Ulrich v. General Motors LLC*, 24 Civ. 11007 (E.D. Mich) (the "*Ulrich* Action"). *Id.* at 8. Those plaintiffs brought claims against GM under California, Connecticut, Indiana, Iowa, Massachusetts, Missouri, North Dakota, Oregon, Rhode Island, and South Dakota law. *Id.*

### B.    S4's Services in Connection with the Underlying Actions

S4 is a New Jersey-based company that provides support services to law firms in connection with class action litigation. Dkt. 18-1 ("Clemente Decl.") ¶ 5. Law firms hire S4 to create pages on ClassAction.org about pending and anticipated litigation, allowing counsel to publicize mass litigation and identify prospective clients via questionnaires. *Id.* Berger

Montague PC ("class counsel"), one of the law firms that represents plaintiffs in the underlying actions, hired S4 to assist with the litigation against GM. *Id.* ¶ 7.

In April 2019, S4 published a page on ClassAction.org titled "GM Facing Class Action Lawsuit Over Transmission Problem." Dkt. 3-4 ("Webpage") at 2; CC Mot. at 4. The Webpage stated: "General Motors is facing a class action lawsuit that alleges some of its automatic eight-speed Chevrolet, Cadillac and GMC vehicles have a defect in their transmissions." *Id.* It stated: "More people are needed to come forward to strengthen the litigation against GM. If you had this problem with your GM eight-speed vehicle, fill out the form on this page and tell us what happened."[2] *Id.* The Webpage described the vehicles named in the lawsuit, the issues people had reported with their transmissions, the "dozens of complaints" submitted to the National Highway Traffic Safety Administration, and the "problem" identified in the lawsuit. *Id.* at 2–4. It stated that a class action lawsuit can help consumers "get back the money they spent on repairs," "recover compensation for the loss in the value of their cars," and "hold GM accountable for the issue and force a fix for the problem." *Id.* at 4.

The form (the "questionnaire") appeared on the side of the Webpage under the header "Get in Touch." *Id.* at 1. It contained boxes for users to input their first name, last name, email, phone number, zip code, and "case details." *Id.* Below those boxes was a message that stated: "By submitting this form, I agree to the Terms, Disclaimer and Privacy Notice." *Id.* Below that message was a question mark icon, with the text: "What happens when I fill out this form?" *Id.*

---

[2] Other parts of the Webpage also encouraged consumers to fill out the form. *See* Webpage at 1 (stating that consumers can "get involved" by "fill[ing] out the form on this page," and that "[m]ore people are needed to come forward and share their stories to strengthen the class action against GM"); *id.* at 5 ("If you would like to learn more about this class action lawsuit, fill out the form on this page.").

If a user clicked on that icon, the Webpage stated: "Your inquiry will be forwarded to one of the attorneys we work with."  Dkt. 30-2 ("Pop-Up Window")

Cole Ulrich, Caroline Harper, Jerry Carroll, Donald Dykshorn, Donald Sicura, Robert Higgins, and David Thompson (collectively, "plaintiffs") are or were plaintiffs in the underlying actions.[3]  They are among those who viewed the Webpage and filled out the questionnaire regarding potential claims against GM.  Each represents that, when they filled out the questionnaire, they expected the information "would be sent to a lawyer and that the communication would be confidential."  Dkts. 7-5 ("Ulrich Decl.") ¶ 4; 7-6 ("Harper Decl.") ¶ 4; 7-7 ("Carroll Decl.") ¶ 4; 7-8 ("Dykshorn Decl.") ¶ 4; 7-9 ("Sicura Decl.") ¶ 4; 7-10 ("Higgins Decl.") ¶ 4; 7-11 ("Thompson Decl.") ¶ 4.

### C.    S4's Policies

In April 2019, when S4 published the Webpage, four pages on ClassAction.org set out its policies with respect to confidentiality, legal advice, and attorney-client relationships.

First, S4's Terms of Use stated that users agree that S4 "may release your contact information and all information that may be provided by you" to the lawyers and law firms "sponsoring the submission forms for the topics you have chosen."  Dkt. 20-2 ("Terms") ¶ 2. The Terms also state:

> You acknowledge and agree that any questions, comments, suggestions, ideas, feedback, or other information about the Site or the Services ("Submissions") provided by you are non-confidential and shall become S4's sole property.  S4 will own exclusive rights (including all intellectual property rights) in and to, and will be entitled to unrestricted use and dissemination of, each such Submission provided

---

[3] Harper is the only plaintiff who neither was nor is a plaintiff in the underlying actions.  She is a plaintiff in a separate action, which brought California claims related to the automatic transmissions.  Dkt. 2 ("Pls. Mot.") at 1 n.2, 8 n.10.  No subpoena has been issued in that matter, but Harper has an interest in the present motions to quash because the Subpoenas seek any questionnaires and communications between her and S4.  *Id.*

by you for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

*Id.* ¶ 9. As to a potential attorney-client relationship, the Terms stated that S4 "does not provide legal advice," and that the information provided by users via the website "is not privileged and does not create, and its receipt by the reader does not establish or constitute, an attorney-client relationship."[4]  *Id.* ¶ 4.

Second, S4's Disclaimer stated that "[t]he information on this website does not establish an attorney[-]client relationship between you and Season 4, LLC."  Dkt. 20-4 ("Disclaimer") at 2.  It stated that submitting a form "will not create an attorney-client relationship and nothing provided or contained in our service or website is to be considered an offer to represent you in any manner."  *Id.*  It also disclaimed any responsibility on the part of S4 for communications between users and lawyers.  *Id.*

Third, S4's Privacy Notice stated: "When you submit a report for a claim or file for a claim, your information and inquiry will be forwarded to one of the attorneys we work with."  Dkt. 20-3 ("Privacy Notice") at 15.  It added that S4 "may be legally required to disclose" users' personal data in certain instances, such as when such disclosure is required by law or necessary to protect S4 from legal action.  *Id.*

---

[4] The Terms further stated:

> Submitting a case evaluation or any type of response or other information through the Service or otherwise via the Site will not create an attorney-client relationship and nothing provided or contained in the Service or the Site is to be considered an offer to represent you in any manner.  Any communications that you have with lawyers, law firms, legal financial service providers or other legal service providers contacted via the Service are not the responsibility of S4.

Terms ¶ 4.

Fourth, the About Us page contained a frequently asked questions ("FAQs") section. Dkt. 28-3 ("About Us") at 5.  In response to the question, "Is my information kept private?" the website stated: "The only thing we will do with the information you provide us is send it to the attorneys we work with so that you can take legal action or get help.  Your information will never go to any other third party."  *Id.*

### D.    GM's Subpoenas

On November 18, 2025, GM served the Subpoenas on S4.  *See* Dkts. 7-1, 7-2, 7-3 ("Subpoenas").  An identical subpoena was issued in each underlying action.  Dkt. 18 ("S4 Mot.") at 1.

GM's Subpoenas seek any and all documents that: (1) reflect communications between S4 and class counsel, or referral fee agreements between S4 and class counsel (or any of the other law firms involved in litigation related to GM's eight-speed automatic transmissions); (2) contain communications related to 16 GM vehicle models from various years; (3) relate to the underlying actions; (4) relate to individuals or entities who signed up through S4 to join any investigation relating to eight-speed transmissions in any GM vehicle; (5) relate to a list of 112 individuals; (6) reflect advertisements related to ClassAction.org[5] and eight-speed transmissions in any GM vehicle; or (7) relate to any social media account or forum posts by S4 related to eight-speed transmissions in any GM vehicle.  Subpoenas at 2–4.

As to the fifth item, S4 represents that the 112 individuals listed are "dismissed plaintiffs, proposed but rejected plaintiffs, or current plaintiffs" in the underlying actions.  S4 Mot. at 5.

---

[5] The Subpoenas state that they seek documents "reflecting advertisements relating to topclassactions.com."  Subpoenas at 4.  Movants assume the reference to topclassactions.com, rather than classaction.org, to be a "typographical error."  Pls. Mot. at 2 n.4.  Insofar as the Subpoenas are directed to S4—which disseminates information through ClassAction.org—the Court adopts this assumption.

E.    **Procedural History of This Action**

On December 1, 2025, plaintiffs and class counsel on behalf of Unidentified Respondents (collectively, the "questionnaire respondents"[6]) moved to quash the Subpoenas. Dkts. 2 ("Pls. Mot."), 6 ("CC Mot."). On December 15, 2025, S4 moved to quash the Subpoenas. Dkt. 18 ("S4 Mot."). In support, plaintiffs, class counsel, and S4 (collectively, "movants") filed declarations and exhibits. Dkts. 3, 7, 18.

On December 15, 2025, GM opposed the questionnaire respondents' motions to quash. Dkt. 19 ("Opp'n to QR"). On December 23, 2025, GM opposed S4's motion to quash. Dkt. 24 ("Opp'n to S4"). GM filed declarations and exhibits in support of both motions. Dkts. 20, 25.

On December 29, 2025, movants filed separate replies in support of the motions to quash. Dkts. 26 ("Pls. Reply"), 27 ("CC Reply"), 29 ("S4 Reply"). Movants filed additional declarations and exhibits in support. Dkts. 28, 30.

II.    **Applicable Legal Standard**

In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Federal Rule of Civil Procedure 45(d)(3)(A) directs the Court to quash or modify subpoenas only in limited circumstances, such as where the subpoena "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden." To survive a motion to quash, "the party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Alex & Ani, Inc. v. MOA Int'l Corp.*, No. 10 Civ. 4590, 2011 WL 6413612, at *3 (S.D.N.Y. Dec. 21, 2011) (citation omitted). However,

---

[6] The Court groups plaintiffs and class counsel together at points in its analysis because GM opposed their motions to quash collectively, and because class counsel represent individuals who responded to the questionnaire.

"[t]he movant bears the burden of persuasion." *Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11 Civ. 1590, 2013 WL 57892, at *2 (S.D.N.Y. Jan. 4, 2013).

## III.    Discussion

Movants argue that the Subpoenas should be quashed in full on numerous grounds, including that they call for the production of privileged materials and seek documents irrelevant to the underlying actions.  The Court considers each category of documents in turn.

### A.    Questionnaires and Communications from S4 Users

The Subpoenas seek "[a]ny and all documents or communications relating to individuals or entities who signed up through one of your websites to join any investigation relating to eight-speed transmissions in any General Motors LLC vehicle."  Subpoenas at 3.  Because the questionnaires appear to have been the principal means through which S4 users submitted information related to the underlying actions, the Court focuses its analysis on whether the questionnaires are discoverable.

#### 1.    Applicable Legal Standard

In a diversity case such as this, "the existence of a privilege is to be determined by reference to state law." *Application of Am. Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir. 1989); *see also* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.").  The question is *which* state's law governs.  The answer is found by "apply[ing] the conflict of law rules prevailing in the state in which" the Court is situated. *Tartaglia v. Paul Revere Life Ins. Co.*, 948 F. Supp. 325, 326 (S.D.N.Y. 1996).  "New York courts apply the law of the place where the evidence in question will be introduced at trial, or the location of the discovery proceeding itself." *Elliott Assocs., L.P. v. Republic of Peru*, 176 F.R.D. 93, 96 (S.D.N.Y. 1997).

Here, the trials will take place in Michigan, and the discovery proceeding is in New York.  Because GM is a citizen of Michigan and all three actions are pending in the Eastern District of Michigan, the Court finds that, as between the two states, Michigan has the "greatest concern."  *Tartaglia*, 948 F. Supp. at 326 (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 481–82 (1963)).  Accordingly, Michigan law governs the determination of privilege.[7]  *See, e.g.*, *Berger Montague, PC v. Robinhood Financial LLC*, 23 Misc. 75, Dkt. 31 at 35–36 (S.D.N.Y. April 24, 2024) ("*Berger*") (resolving motion to quash based on privilege law of state where evidence would be introduced, not where discovery proceeding occurred).

Under Michigan law, "attorney-client privilege attaches to direct communication between a client and his attorney as well as communications made through their respective agents."  *Reed Dairy Farm v. Consumers Power Co.*, 576 N.W.2d 709, 711 (Mich. Ct. App. 1998).  The communication must have been "confidential" and "made for the purpose of obtaining legal advice."  *Id.*

### 2.    Analysis

The questionnaires constitute communications (1) between prospective class members and class counsel's agent, (2) made confidentially, (3) for the purpose of obtaining legal advice

---

[7] Although the parties address choice of law in different ways, and to varying degrees, in their briefs, they do not dispute which state's privilege law applies.  S4 contends that Michigan law applies for the reasons adopted by the Court.  S4 Mot. at 10.  Plaintiffs and class counsel argue that "the Court need not engage in lengthy conflict-of-law analysis" because GM vehicles were purchased or leased in all 50 states, and "there is no conflict" between the states' privilege laws.  Pls. Mot. at 10; CC Mot. at 10.  GM does not address the applicable law, citing instead to federal cases on attorney-client privilege arising from multiple jurisdictions.  *See* Opp'n to QR at 7–10.

or assistance.[8]  They are therefore protected by the attorney-client privilege.  The Court grants the motions to quash as to this first category of documents.[9]

a.    *Between Client and Attorney or Their Respective Agents*

The first requirement is that the communications must have been between a client and attorney or their respective agents.  Pre-retention communications between a prospective client and lawyer are protected by the attorney-client privilege.  *See People v. Rolark*, 2013 WL 2278083, at *5 (Mich. Ct. App. May 23, 2013) ("The application of the attorney-client privilege to discussions between clients and *prospective* counsel is nearly as old as the privilege itself." (emphasis in original)).  Here, the questionnaire respondents were prospective clients because they were seeking consultation "about the possibility of forming a client-lawyer relationship with respect to a matter"—an issue addressed below.  *L. Offs. of Jeffrey Sherbow, PC v. Fieger & Fieger, PC*, 968 N.W.2d 367, 382 (Mich. 2021) (citation omitted).  And S4 was acting as an agent of class counsel by performing the "essential" service, *Grubbs v. K Mart Corp.*, 411 N.W.2d 477, 480 (Mich. Ct. App. 1987), of informing potential class members about the GM class action and providing a mechanism for them to "share their stories" related to defective eight-speed automatic transmissions and "get involved" in the litigation, Webpage at 2. *See, e.g.*, *Berger*, Dkt. 31 at 40 (finding, in case involving subpoena in class action litigation against a different defendant, that S4's "marketing and connection services were necessary to

---

[8] GM argues that S4 has "waived its privilege and work product claims by failing to assert them with specificity on a privilege log."  Opp'n to S4 at 6.  That is wrong.  According to the stipulated protective orders attached to the Subpoenas, S4's privilege log must be "produced within 60 days of the production of underlying documents."  Subpoenas ¶ 11.1.

[9] Because the Court finds that the questionnaires are protected by attorney-client privilege, which is "absolute," *People v. Culberson*, 2021 WL 68786, at *6 (Mich. Ct. App. Jan. 7, 2021) (citation omitted), it does not reach the separate question whether they are also protected by the work-product doctrine, whose protections are qualified.

Berger Montague to obtain clients for this matter" and to "maintain an effective class action").

Accordingly, the questionnaires constitute communications between prospective clients and class counsel's agent.

In arguing otherwise, GM denies that S4's "advertising services were '[n]ecessary' for Plaintiffs' counsel to 'perform . . . fundamental client communications' or to 'communicate' with clients." Opp'n to S4 at 3 (quoting *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 87–88, 91–92 (S.D.N.Y. 2019)). But S4 facilitated communication between prospective clients and class counsel—an essential task in mass litigation involving thousands of consumers across the 50 states. *See* CC Mot. at 10. The cases on which GM relies are not to the contrary. *Universal Standard Inc.*, for example, found that disclosure of communications to a public relations firm—which was "hired not by the attorney but by" the client—destroyed the attorney-client privilege because the firm merely monitored an email account that received public relations and press inquiries "unrelated to seeking legal advice." *See Universal Standard Inc.*, 331 F.R.D. at 87–89. Here, in contrast, S4, acting at the direction of class counsel, received users' questionnaires regarding their potential *legal claims* against GM and connected them to class counsel for *ongoing litigation*. Clemente Decl. ¶¶ 7–8. This first requirement is thus satisfied. *See, e.g.*, *Valdez v. Town of Brookhaven*, No. 5 Civ. 4323, 2009 WL 10702070, at *2 (E.D.N.Y. Feb. 5, 2009) (involvement of non-attorneys did not eliminate privilege where "non-attorney interviewers . . . initiated a communication with a potential client *at the direction of the counsel* for the purposes of obtaining legal advice" (emphasis in original)).

           b.      *Confidential*

The communications must also have been confidential. In considering the confidentiality of similar questionnaires, courts have considered whether it was reasonable for respondents to

11

believe their submissions would be kept confidential, based on the website's statements about confidentiality, dissemination to third parties, and transmission to law firms/lawyers. *See, e.g.*, *Berger*, Dkt. 31 at 41; *In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 611759, No. 14 MD 2543, at *1 (S.D.N.Y. Jan. 29, 2018) ("*In re Gen. Motors*"); *Barton v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 410 F.3d 1104, 1110–11 (9th Cir. 2005). On balance, these support the reasonableness of the questionnaire respondents' claim to have expected confidentiality.

First, the Terms and Privacy Notice—to which users agreed when they submitted their questionnaires—both stated that the information provided via the questionnaires would be transmitted to the lawyer or law firm sponsoring the submission. It did not list any other person or entity to whom the information would be provided. *See* Terms ¶ 2 (S4 "may release your contact information and all information that may be provided by you" to the law firms "sponsoring the submission forms"); Privacy Notice at 15 ("When you submit a report for a claim or file for a claim, your information and inquiry will be forwarded to one of the attorneys we work with."). This language suggested that the questionnaires were private communications between the lawyers and questionnaire respondents.

Second, the About Us page contained definitive language about the confidentiality of the information provided in questionnaires. It stated that "*[t]he only thing* we will do with the information you provide us is send it to the attorneys we work with so that you can take legal action or get help," and that "[y]our information will *never* go to any other third party." About Us at 5 (emphasis added).

Third, the website did not disclaim confidentiality as to the questionnaires submitted by potential plaintiffs for transmittal to law firms. The Terms stated that "any questions, comments, suggestions, ideas, feedback, or other information *about the Site or the Services . . .* are non-

confidential and shall become S4's sole property." Terms ¶ 9 (emphasis added). But that language applied to proposals by users regarding potential improvements to S4, not to the information submitted to law firms in questionnaires. *See* S4 Reply at 3. The Privacy Notice likewise noted the potential use or disclosure of users' information, but it did not disclaim confidentiality. It merely stated—as is axiomatic even with privileged communications—that S4 "may be legally required to disclose" data in certain instances, such as when such disclosure is "required by subpoena, law, or other legal process," or "necessary to assist law enforcement officials or government agencies." Privacy Notice at 15.

Taken together, these statements in the Terms and Privacy Notice supported that the materials submitted by potential plaintiffs would be shared with third parties only if they concerned suggestions or feedback for S4 or were legally required to be released. They therefore are far afield from the disclaimers courts have found to defeat a reasonable expectation of confidentiality, such as ones that expressly stated that information would not be kept confidential and would be turned over to third parties other than the law firms. *See, e.g.*, *In re Gen. Motors.*, 2018 WL 611759, at *1 (finding assertion of privilege "founder[ed] . . . on the requirement of confidentiality" where webpage "expressly warned users that any 'information' a user provided through the website was 'considered *nonconfidential*'" (emphasis in original)); *In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 952315, at *5 (N.D. Fla. Mar. 12, 2021) (finding that "record belies any suggestion" of confidentiality where "[t]he form itself advised viewers of the possibility that the information would be disclosed" and legal notice stated that any information provided was "non-confidential"); *Schiller v. City of N.Y.*, 245 F.R.D. 112, 116 (S.D.N.Y. 2007) (finding that questionnaire did not imply confidentiality where it "suggested that the information provided would be used to help 'other legal organizations' advocate for

13

change and that the information would be kept confidential only if the survey respondent affirmatively requested it").

Based on the foregoing, the respondents reasonably understood their questionnaires to be confidential communications. *See, e.g.*, *Berger*, Dkt. 31 at 41–42 (finding S4's website supported "reasonable expectation of confidentiality" based on its promises that information would be sent to law firms, kept confidential, and not disseminated to other third parties unless required by court); *Barton*, 410 F.3d at 1110 (finding questionnaire supported expectation of confidentiality where "[n]either the word 'confidentiality' nor the substance of a disclaimer of confidentiality can be found in the online questionnaire").

GM's arguments to the contrary are unavailing.

GM argues that *Berger* is inapposite because that case considered S4's Terms as of 2021, which by then also included an "express promise" that S4 would keep users' information "confidential." Opp'n to QR at 8. The 2021 Terms did add that word, so *Berger* is formally distinguishable. But those Terms are otherwise substantively indistinguishable from the 2019 Terms. *See Berger*, Dkt. 6-4 ("2021 Terms") at 11–12 (noting that information would be kept confidential "unless ordered to produce [it] by a court of law," that feedback about the website is "non-confidential," and that S4 cannot guarantee that users' personal information will not be disclosed to third parties). Because *Berger* considered highly similar Terms and involved the same service provider (S4) and law firm (Berger Montague PC), it is persuasive authority.

GM also argues that the statements about confidentiality on the About Us page are irrelevant because they "do not appear anywhere on the at-issue advertisement" and "are contradicted by the various policies" in the Terms. Opp'n to QR at 7. But users were, if anything, more likely to read the About Us page, which contained FAQs with short questions

14

and answers written in plain language (*e.g.*, "Are you guys a law firm?" "What happens after I contact you?"), than the Terms, which ran 19 pages and contained numerous disclaimers and legal jargon.  And the About Us page's statement that "[t]he only thing we will do with the information you provide us is send it to the attorneys we work with," About Us at 5, is consistent with the Terms, which stated that information would go to attorneys and be shared with third parties only if required by law, Terms ¶¶ 2, 7.  Accordingly, although the About Us page is only one data point informing the Court's analysis, GM is wrong to put it aside altogether.  The Court finds that this second requirement is satisfied.

> *c.*        *For the Purpose of Obtaining Legal Advice or Representation*

In assessing whether questionnaires were completed for the purpose of obtaining legal advice or representation, courts consider whether they referenced ongoing litigation, stated an intention of soliciting clients, were distributed by attorneys, were used in litigation, or were kept confidential and provided only to lawyers.  *See, e.g.*, *Barton*, 410 F.3d at 1110; *Gates v. Rohm & Haas Co.*, 2006 WL 3420591, at *5 (E.D. Pa. Nov. 22, 2006); *Vodak v. City of Chicago*, 2004 WL 783051, at *2 (N.D. Ill. Jan. 16, 2004).  Because "[m]ore important than what the law firm intended is what the clients thought," *Barton*, 410 F.3d at 1107, courts also consider whether respondents believed that they were seeking legal advice or representation, *see Vodak*, 2004 WL 783051, at *3.  On balance, these factors support that the questionnaire respondents were seeking legal advice or representation.

First, the Webpage was replete with references to the ongoing GM litigation.  *See* Webpage at 2 (stating that GM "has been hit with a class action lawsuit" and "is facing a class action lawsuit," and listing makes and models of vehicles named in lawsuit); *id.* at 3 (quoting from "the lawsuit"); *id.* at 4 (summarizing what the "class action lawsuit" identifies as "the

[p]roblem," and listing ways in which "class action lawsuit can help consumers"); *id.* at 5 (directing users to "fill out the form on this page" to "learn more about this class action lawsuit"). This case is thus far afield from *Schiller*, on which GM relies. *See* Opp'n to QR at 8–9. There, the New York Civil Liberties Union ("NYCLU") distributed a questionnaire via email and on its website, seeking to collect information about police misconduct at protests to enable the group to "document the policies and practices" of local police and "effectively advocate for change." *Schiller*, 245 F.R.D. at 114. The NYCLU "did not suggest that it intended to institute class litigation," and "had filed no lawsuits at the time it distributed its complaint forms." *Id.* at 117. Here, in contrast, the Webpage was keyed to the class action against GM, which had already been initiated. Based on the Webpage, it is reasonable to conclude that respondents filled out the questionnaire for the purpose of seeking legal advice or representation. *See, e.g.*, *Gates*, 2006 WL 3420591, at *5 (finding questionnaires formed attorney-client relationship where responses were returned to attorneys and "a lawsuit had already been filed at the time the questionnaires were distributed").

Second, the questionnaire's text suggested that its purpose was to connect prospective clients with class counsel. It requested personal information (*e.g.*, name, email, *etc.*), and had a box for "case details," in which respondents could relate their experiences with GM's eight-speed automatic transmissions. Webpage at 2. The form stated that the information provided would be sent to attorneys. Above the "Submit" button was the question—"What Happens When I Fill Out This Form?"—which led to a pop-up window that stated, "Your inquiry will be forwarded to one of the attorneys we work with." Pop-Up Window at 2. And, after submitting a form, respondents received an email, which stated that their response "has been sent to one of the law firms working with ClassAction.org," and that an attorney or member of the law firm "may

16

need to ask you a few questions regarding your inquiry and potential case." Dkt. 20-5

("Confirmation") at 2.  Thus, although the questionnaire did not promise that a representation

would result, it suggested that respondents would be connected to attorneys regarding whether

they "have a case."  *Id.* at 3.  It thus further supports that respondents reasonably sought legal

advice or representation via the questionnaires.  *See, e.g.*, *Barton*, 410 F.3d at 1110 (one factor

supporting that "respondents were trying to secure legal services" was "the context of supplying

information to lawyers who apparently were bringing [the] class action").

Third, the questionnaires were forwarded to class counsel, were not transmitted to any

other law firms or third parties, and were maintained confidentially by S4.  Clemente Decl. ¶¶ 8–

9.  The questionnaires also led to class counsel's representation of numerous individuals,

including plaintiffs.  Pls. Mot at 2.  The post-submission handling of the questionnaires

reinforces that they were submitted and completed to facilitate legal representation.  *See, e.g.*,

*Vodak*, 2004 WL 783051, at *1–2 (finding that respondents "completed the questionnaire for the

purpose of requesting legal representation" where the "information contained on completed

questionnaires was kept confidential and provided only to lawyers who represented the

individuals in court" and the "completed forms were immediately utilized to provide legal

representation"); *Barton*, 410 F.3d at 1110 (same where respondents became plaintiffs in class

action litigation).

Fourth, plaintiffs have filed declarations stating that they "filled out the form on the page

for the purposes of obtaining legal advice regarding a potential legal claim against [GM] related

to GM's vehicles equipped with eight-speed automatic transmissions."  Ulrich Decl. ¶ 3, Harper

Decl. ¶ 3; Carroll Decl. ¶ 3; Dykshorn Decl. ¶ 3; Sicura Decl. ¶ 3; Higgins Decl. ¶ 3; Thompson

Decl. ¶ 3.  The Court gives limited weight to such statements, because they are inherently self-

serving and have not been subjected to cross-examination, but it nevertheless takes them into account as evidence of the respondents' subjective intentions at the time of submission. *Cf. Schiller*, 245 F.R.D. at 116 (no privilege where NYCLU "offered no evidence that any person who completed a questionnaire believed at that time that he or she was seeking representation").

Opposing the conclusion that respondents filled out the questionnaires for the purpose of obtaining legal advice or representation, GM notes that the Terms "repeatedly disclaim any attorney-client relationship."[10]  Opp'n to QR at 7–8.  But, read in context, the Terms primarily disavowed the existence of such a relationship between S4 and respondents, not between respondents and law firms.  *See* Terms ¶ 4 (stating that "S4 is not a law firm" and "does not provide legal advice," and that "[b]y accepting the posting of your complaint, S4 does not offer any advice as to whether you may have a legal remedy").  In any event, to find that the privilege applies, the Court need not find that an attorney-client relationship in fact took root. *See, e.g.*, *Berger*, Dkt. 31 at 39–40 ("[J]ust because Season 4's website disclaimed the creation of [an] attorney-client relationship solely by filling out the response forms does not mean that [respondents] did not reasonably believe that they were providing responses for the purpose of a preliminary consultation to see if they had viable claims.").

Because the questionnaire respondents were prospective clients seeking legal advice or representation, their confidential communications are protected.  *See, e.g.*, *Vodak*, 2004 WL 783051, at *3; *Barton*, 410 F.3d at 1110; *Gates*, 2006 WL 3420591, at *5.

---

[10] GM also highlights other aspects of the Webpage and questionnaires, such as that the Webpage was "operated by a non-attorney," did not disclose class counsels' identities, and sought "stories to strengthen the class action," rather than clients.  Opp'n to QR at 9.  These factors weigh against a finding that the questionnaire respondents were seeking legal services, but do not disturb the Court's assessment, based on the totality of the facts, that "[a] layman seeing" the Webpage "would likely think he was being solicited as a potential client."  *Barton*, 410 F.3d at 1110.

### B.    Communications Between Class Counsel and S4

The Subpoenas seek "[a]ny and all documents reflecting or containing communications" between S4 and law firms, including class counsel, that represent individuals in litigation related to GM's eight-speed automatic transmissions.  Subpoenas at 2.

### 1.    Applicable Legal Standard

Federal law governs the applicability of the work product doctrine "in all actions in federal court."  *Weber v. Paduano*, No. 2 Civ. 3392, 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003) (quoting *Mount Vernon Fire Ins. Co. v. Try 3 Bldg. Servs.*, No. 96 Civ. 5590, 1998 WL 729735, at *4 (S.D.N.Y. Oct. 16, 1998)).  That doctrine, first articulated in *Hickman v. Taylor*, 329 U.S. 495 (1947), is partially codified in Federal Rule of Civil Procedure 26(b)(3).  It defines work product as "documents and tangible things that are prepared in anticipation of litigation . . . by or for another party or its representative."  Fed. R. Civ. P. 26(b)(3)(A).  The party claiming such protection must show that the material was prepared "because of" the prospect of litigation.  *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998).  "At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."  *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234 (2d Cir. 1993) (quoting *United States v. Nobles*, 422 U.S. 225, 238 (1975)).

There are two types of work product: fact and opinion.  *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007).  Fact work product may be discovered if the party seeking it "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  "In contrast, opinion work product reveals the 'mental impressions,

19

conclusions, opinions, or legal theories of an attorney or other representative,' and is entitled to greater protection." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 183 (quoting *Adlman*, 134 F.3d at 1197).

### 2.     Analysis

The written communications between S4 and class counsel constitute work product.

First, these communications are documents that were prepared in anticipation of the GM litigation. A document is prepared in anticipation of litigation "if in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Adlman*, 134 F.3d at 1202 (citation omitted) (emphasis in original). Such was the case here. Class counsel hired S4 "to assist in their *ongoing litigation efforts* in relation to alleged defects in GM's [eight]-speed automatic transmissions." Clemente Decl. ¶ 7 (emphasis added). The purpose of S4's involvement was to "conduct[] a campaign on behalf of Class Counsel and facilitate[] connections with prospective clients who may have claims against GM that are consistent with the putative class." *Id.* The communications between S4 and class counsel were thus prepared "with an eye toward litigation."[11] *Schaeffler v. United States*, 806 F.3d 34, 43 (2d Cir. 2015) (citation omitted); *see, e.g.*, *Berger*, Dkt. 31 at 45 (finding communications between Berger Montague and S4 were "in anticipation of litigation" where "the only reason Berger Montague retained Season 4 was because it was planning to bring a new class action . . . and sought to have

---

[11] GM argues that the requested documents are "business-related communications unprotected by the work product doctrine." Opp'n to QR at 12. But even if the communications were prepared with a business purpose, "the Second Circuit does not limit the doctrine to documents prepared primarily or exclusively to assist in litigation so long as the document can fairly be said to have been prepared . . . because of the prospect of litigation." *Berger*, Dkt. 31 at 45 (citation omitted). Such is so here.

help finding plaintiffs"); *In re Gen. Motors*, 2018 WL 611759, at *2 (same for communications between lead counsel and class action website service provider, where communications were created "as part of counsel's efforts to find named plaintiffs").

Second, the communications were prepared by a "party or its representative." Because the work product doctrine is "an intensely practical one, grounded in the realities of litigation in our adversary system," *Nobles,* 422 U.S. at 238, it protects "communications between attorneys and the agents or representatives that they have retained in anticipation of litigation—such as consultants and document specialists," *Hallmark Cards, Inc. v. Murley*, No. 9 Civ. 377, 2010 WL 4608678, at *5 (S.D.N.Y. Nov. 9, 2010). As described above, S4 was operating as an agent of class counsel by providing publication and client connection services related to the underlying actions. *See, e.g.*, *Costabile v. Westchester*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) ("Agents include those who are enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparing for litigation."). Accordingly, the communications exchanged between S4 and class counsel are work product. *See, e.g.*, *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) (applying work product doctrine to communications between attorney and public relations firm); *Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*, No. 2 Civ. 7955, 2003 WL 21998674, at *5 (S.D.N.Y. Aug. 25, 2003) (similar).

GM argues that, even if the communications are work product, the need for protection is "overcome by GM's substantial need for the requested materials."[12] Opp'n to S4 at 4. It argues

---

[12] GM argues that, if the communications were found to be work product, they constitute fact work product, such that the protection can be overcome by a showing of substantial need. Opp'n to QR at 2. Movants, in contrast, argue that the communications constitute opinion work product because class counsel provided directions to S4 regarding the design of the Webpage and offered assessment of respondents' claims based on class counsel's litigation strategy, Dkt. 7 ("Paul Decl.") ¶ 17, thus requiring a heightened showing to overcome the protection, Pls. Mot. at 18.

that it needs the communications because they are germane to the adequacy of class counsel under Federal Rule of Civil Procedure 23. Opp'n to QR at 14. That is unpersuasive. Substantial need is established where the materials sought are "essential to the preparation of one's case," *Hickman*, 329 U.S. at 511, or "central to the substantive claims in litigation," *Madanes v. Madanes,* 199 F.R.D. 135, 150 (S.D.N.Y. 2001). Although class counsel's communications with S4 may be relevant to the quality of its representation, "[m]ere relevance is insufficient to establish substantial need." *United States v. Anthem, Inc*., No. 20 Civ. 2593, 2025 WL 2426482, at *6 (S.D.N.Y. Aug. 22, 2025). GM has not described with any specificity how the content of these communications, as opposed to the fact of S4's retention by class counsel, bears on class counsel's adequacy. *See id.* (requiring "a concrete reason articulated by the party seeking the documents to show substantial need"); *Berger*, Dkt. 31 at 47 (defendant "fails to convincingly explain" why communications between Berger Montague and S4 are relevant to class counsel's adequacy); *see also Francis v. United States*, No. 9 Civ. 4004, 2011 WL 2224509, at *4 (S.D.N.Y. May 31, 2011) (not finding substantial need where "[i]t is unclear why the plaintiffs would need" the materials sought). GM also has not offered any "evidence whatsoever establishing that the information is not available to them from other sources." *A.I.A. Holdings, S.A. v. Lehman Bros.*, No. 97 Civ. 4978, 2002 WL 31385824, at *7 (S.D.N.Y. Oct. 21, 2002), *supplemented sub nom. A.I.A. Holdings v. Lehman Bro., Inc.*, No. 97 Civ. 4978, 2002 WL 31556382, at *7 (S.D.N.Y. Nov. 15, 2002). Accordingly, GM has not met its burden of demonstrating substantial need.

---

Because the Court finds that GM has not made even the lesser showing of "substantial need," it need not resolve this dispute.

Because the communications between class counsel and S4 constitute work product, and GM has not made a showing of substantial need to overcome that doctrine's protection, the motions to quash are granted with respect to this category of materials. *See, e.g.*, *In re Gen. Motors*, 2018 WL 611759, at \*2 (finding emails between lead counsel and class action website service provider protected by work product doctrine); *Berger*, Dkt. 31, at 43–45 (same).

### C.    Remaining Categories of Documents

The Subpoenas seek various other categories of materials.  The Court grants the motions to quash as to two of these categories but denies the motions as to two others.

#### 1.    Applicable Legal Standard

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," considering, *inter alia*, "the importance of the issues at stake in the action," "the importance of the discovery in resolving the issues," and "whether the burden or expense of the proposed discovery outweighs its likely benefit."  A matter is relevant if it encompasses "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  The party seeking discovery bears the burden of demonstrating its relevance. *See Trilegiant Corp. v. Sitel Corp.*, 272 F.R.D. 360, 363 (S.D.N.Y. 2010).

#### 2.    Analysis

***Fee Agreements***:  The Subpoenas seek "[a]ny and all documents reflecting or containing referral fee agreements" between S4 and law firms, including class counsel, that represent individuals in litigation related to GM's eight-speed automatic transmissions.  Subpoenas at 2. GM does not argue that such documents are relevant to any claim or defense in the underlying

23

actions (*e.g.*, whether GM breached express and implied warranties or violated consumer protection statutes in several states). *See* S4 Mot. at 22. Instead, GM states that these materials bear on class certification because they are "highly relevant to Plaintiffs' counsel's adequacy to serve as class counsel." Opp'n to S4 at 1. But GM does not explain why the terms of class counsel's retention of a third-party service provider are probative of adequacy. Accordingly, the Court grants the motion to quash as to this category of documents. *See, e.g.*, *Berger*, Dkt. 31 at 47 (finding "contracts between Berger Montague and Season 4" "irrelevant to the underlying litigation").

*Advertisements and Social Media Posts*: The Subpoenas also seek "[a]ny and all documents or communications . . . relating to eight-speed transmissions in any General Motors LLC vehicle" that: "reflect[] advertisements," "relat[e] to any social media account maintained by [S4]," or "relat[e] to any forum post by an account maintained by [S4]." Subpoenas at 4. To the extent the Subpoenas seek S4's publicly available advertisements and social media posts related to the GM litigation, that request is proper. Such materials are reasonably related to the underlying actions because GM intends to invoke the statute of limitations in opposing class certification, making "a live issue . . . when putative class members knew or should have known of their claims." Opp'n to QR at 13. The request is also not unduly burdensome, as S4 does not contend that it authored or publicized a large number of advertisements or forum posts related to this litigation. And it does not implicate privileged materials because these documents were made available to the public. However, to the extent that the Subpoenas seek documents *related to* the advertisements or posts, but not the publicly available advertisements or posts themselves,

the Court grants the motions to quash for the reasons above.  Such materials constitute work product, and GM has not made a showing of substantial need as to them.[13]

***Names of Respondents and Dates of Responses***:  GM argues that, even if the questionnaires themselves are held not discoverable, "S4 should at least provide the names of Plaintiffs and Unidentified Respondents and the dates they submitted questionnaire responses."  Opp'n to QR at 2.  Movants counter that such materials are protected by the work product doctrine, because they would reveal "the identit[ies] of putative class members that Class Counsel chose to interview as well as [the] identit[ies] of putative class members class counsel ultimately chose not to include as a named party."  Pls. Mot. at 17–18.  On this point, GM is correct.

The Subpoenas properly seek the names of all respondents to S4's questionnaire—not merely the Unidentified Respondents—and the dates of their responses.[14]  The questionnaires themselves are protected communications, but this information within them is not.  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 220 F.R.D. 30, 34 (S.D.N.Y. 2003) ("The work product doctrine exists to protect materials created by an attorney in preparation for litigation; typically, the underlying factual matters are not protected.").  And the information sought is relevant,

---

[13] S4 separately argues that the Subpoenas should be quashed because they seek disclosure of S4's confidential research and commercial information.  S4 Mot. at 21.  Because the Court grants the motions to quash with respect to S4's fee agreements, communications with class counsel, and communications with questionnaire respondents, this concern is moot as to those categories of documents.  As to publicly available advertisements and posts, S4 does not explain why these are "confidential research and commercial information" that should be protected from disclosure.  Accordingly, this argument does not provide a basis to quash the request for such materials.

[14] To the extent that the Subpoenas seek the names of respondents to questionnaires related to GM's eight-speed automatic transmissions beyond those created by class counsel, Subpoenas at 3, the Court finds that request proper for the same reasons.  The identities of respondents are not protected, and such information is relevant to the underlying actions because it goes to when putative class members knew of the issues with their transmissions.

because, as noted, it bears on the interplay between the statute of limitations and class certification in the underlying actions.

The movants' counter-argument—that respondents' identities constitute work product because their disclosure would reveal class counsel's strategy or mental impressions—is not persuasive. The underlying actions implicate at least 16 GM vehicles—for years dating back to 2015—which were purchased or leased across 50 states. Although movants do not state how many consumers responded to the questionnaire, it is reasonable to assume that there were tens or hundreds of thousands. It is thus highly unlikely that this list of names would educate GM as to class counsel's strategy, especially because the list of respondents—unlike, for example, a list of persons whom class counsel contacted for interviews—would not reveal anything about class counsel's thought processes. *Cf. Don v. Unum Life Ins. Co. of Am.*, 2014 WL 12603207, at *2 (C.D. Cal. Nov. 4, 2014) (identities of "six putative class members" constituted work product because "disclosure of the identity of the particular putative class members contacted by Plaintiff's counsel would open the door to revealing Plaintiff's counsel's strategy and mindset").

Accordingly, the Court denies the motions to quash with respect to the names of all questionnaire respondents and the dates on which they submitted their questionnaires.[15] *See,*

---

[15] Movants make several other meritless arguments against disclosure of respondents' names. First, class counsel argues that revealing the names of heretofore unidentified respondents would reveal confidential information—*i.e.*, that "they owned or leased GM-manufactured vehicles equipped with defective eight-speed transmissions and sought legal advice regarding legal action against GM." CC Mot. at 16. But, as movants acknowledge, it is only in "unusual situations" that disclosing a client's name has been found to impermissibly betray the nature of their legal problems, *id.* at 15–16 (citation omitted), such as where production of the list of persons responding to an advertisement would reveal a "patient's ailment" and thus breach the "physician-patient privilege," *Rosso, Johnson, Rosso & Ebersold v. Superior Ct.*, 191 Cal. App. 3d 1514, 1519 (Ct. App. 1987). This is not that rare case.

Second, S4 argues that the Subpoenas will harm S4's business, which depends on its ability to maintain confidential communications with potential claimants. S4 Mot. at 24–25. Because the

*e.g.*, *Gates*, 2006 WL 3420591, at *2 ("names and addresses of the putative class members" discoverable, "even if the questionnaires themselves are not"); *Tyler v. Suffolk Cnty.*, 256 F.R.D. 34, 38 (D. Mass. 2009) ("names and contact information" of questionnaire respondents "does not receive the protection of . . . the work product doctrine").

***Other Documents Related to At-Issue Vehicles and the 112 Individuals***:   The Subpoenas also seek "[a]ny and all documents or communications" relating to 16 vehicle models from various years or relating to a list of 112 individuals.  Subpoenas at 2–3.  Movants argue that these requests are "dramatically overbroad" because "many of those documents were acquired and created in anticipation of other litigations entirely."  S4 Mot. at 22–23.  GM responds that such documents "could be relevant to . . . Plaintiffs' adequacy to serve as class representatives, not to mention serve as useful impeachment for Plaintiffs who denied having ever submitted information to ClassAction.org."  Opp'n to S4 at 8.

Movants are correct.  This sweeping request, unlimited by time frame or connection to GM's eight-speed automatic transmissions, is likely to capture information unrelated to the underlying actions.  "Blanket requests of this kind are plainly overbroad and impermissible." *Henry v. Morgan's Hotel Grp., Inc.*, No. 15 Civ. 1789, 2016 WL 303114, at *2 (S.D.N.Y. Jan. 25, 2016) (granting motion to quash subpoenas that sought "all documents and communications" related to plaintiff).  GM's claim of theoretical relevance would justify any subpoena—no matter how broad—in class action litigation where the proponent imagined a possibility that the records might undermine named plaintiffs' adequacy.  "While the scope of

---

Court has granted the motions to quash with respect to the questionnaires and communications between S4 and questionnaire respondents, this concern is largely moot.  Although disclosure of respondents' names might undermine the promise of complete confidentiality made by S4 on the About Us page, it would not do so so substantially as to materially harm S4's future business.

relevance is broad," the Federal Rules do not "permit a fishing expedition." *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16 Civ. 2242, 2018 WL 4112816, at *1 (S.D.N.Y. Aug. 29, 2018) (citation omitted).  Accordingly, the motions to quash are granted as to this category of documents.[16]

## CONCLUSION

For the foregoing reasons, the Court grants the motions to quash, except as to two discrete categories of documents: (1) S4's public forum posts and advertisements related to the underlying actions, and (2) the names of all questionnaire respondents, and the dates of their submissions.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 1, 5, and 17.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: January 23, 2026
      New York, New York

---

[16] GM's subpoenas seek "any and all" information held by S4 within nine broad categories.  *See* p. 6, *supra*.  GM has not identified with specificity—beyond the items addressed in the Court's analysis—any additional materials held by S4 that it seeks or why these are relevant to the underlying litigations.  The Court thus does not address the categories of documents that could conceivably be covered by the Subpoenas.